UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TIMOTHY MATTHEWS,                    *
                                     *
              Plaintiff,             *        Civil Action No. 06-330 GMS
        v.                           *
                                     *
MOUNTAIRE FARMS                      *
OF DELAWARE, *et al.*                *
                                     *
              Defendants.            *
_____/

APPENDIX TO THE OPENING BRIEF IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Roger D. Landon (Del. Bar. No. 2460)
MURPHY & LANDON
1011 Centre Road, #210
Wilmington, Delaware 19805
Telephone:  (302) 472-8100
Facsimile:  (302) 472-8135

Arthur M. Brewer (Admitted *Pro Hac Vice*)
Eric Hemmendinger
Teresa D. Teare
SHAWE & ROSENTHAL, LLP
20 S. Charles Street, 11th Floor
Baltimore, MD  21201
Telephone:  (410) 752-1040
Facsimile:  (410) 752-8861

*Attorneys for Defendants*

July 9, 2007

**TABLE OF EXHIBITS**

| PAGE | TITLE | TAB |
|------|-------|-----|
| A00001-A00008 | Affidavit of Roland Lynch | A |
| A00009-A00012 | Affidavit of Wells Betts | B |
| A00013-A00020 | Affidavit of Claudia Pittman | C |
| A00021-A00023 | Affidavit of Robert Johnson | D |
| A00024 | Letter from Trina R.D. Wheedleton, Labor Law Enforcement Officer II, Delaware Department of Labor, dated September 15, 2005 | E |

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that Defendants' Motion for Summary Judgment, Opening Brief in Support of Motion for Summary Judgment and Appendix to the Opening Brief were served this 9th day of July, 2007, by First Class mail, postage prepaid, upon:

    Timothy Matthews
    P. O. Box 1453
    Seaford, DE  19973


                                   */s/ Roger D. Landon*
                                   Roger D. Landon, No. 2460

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TIMOTHY MATTHEWS, | * | |
| | * | |
| Plaintiff, | * | Civil Action No. 06-330 |
| v. | * | |
| | * | |
| MOUNTAIRE FARMS | * | |
| OF DELAWARE, *et al.* | * | |
| | * | |
| Defendants. | * | |
| | / | |

### AFFIDAVIT OF ROLAND LYNCH

I, Roland Lynch, state under oath as follows in support of the Defendants' Motion for Summary Judgment:

1.     I am over twenty-one (21) years of age and have personal knowledge of the facts/matters contained herein.

2.     I am currently employed by Mountaire Farms of Delaware at its Millsboro, Delaware complex. I have been employed by the Company since 1988 as the Feed Mill Dispatch Supervisor, which job is also known as the Delivery Supervisor.

3.     I am responsible for controlling the type of feed which is delivered by feed truck drivers to various farms in rural parts of Maryland and Delaware.

4.     I supervise the feed truck drivers who are assigned to the Millsboro, Delaware Feed Mill. Feed truck drivers operate 80,000 lb. gross weight tractor-trailers and require a Class 3 Commercial Driver's License in accordance with the United States Department of Transportation regulations.

5.    I interviewed and hired the Plaintiff, Mr. Matthews, on March 24, 2003.

6.    On or about August 4, 2004, Mr. Matthews came to my office and told me his truck would not move. I, along with Mr. Stephen Toomey, another feed truck driver, went to inspect Mr. Matthews' truck. Within a matter of minutes, we diagnosed the problem and removed two (2) quarters (.25) from the vehicle's air flow system which enabled the brakes to release and the truck to get on the road. Mr. Matthews was delayed for approximately one-half (½) hour as a result of this incident. He was compensated for his lost time.

7.    The insertion of coins in the air connections to the trailer, also known in the business as the "glad hands," blocks air flow to the brakes which disables the vehicle and prevents it from being moved. Stated in other terms, it takes air pressure to release the brakes and move the truck. The lack of air pressure in Mr. Matthews' vehicle prevented the vehicle from being moved at all – he could not leave the yard. No person's safety especially that of Mr. Matthews, was in any way jeopardized or compromised. There was no violation of the Company's safety rules.

8.    Several days after the incident referred to in the previous paragraph, Mr. Matthews came to me and told me that Mr. Betts was the person who put the coins in the airflow system of his truck. I approached Mr. Betts about the incident and he admitted that he was the culprit.

9.    The day following Betts' admission, Mr. Matthews came to me and asked me what the Company was going to do about Mr. Betts admitting that he placed quarters (.25) in Mr. Matthews' truck. I asked Mr. Matthews what he wanted done. I also told

2

him that if it were me, I would forget about it and go about my business, but stressed that it was up to him to decide what he wanted done. Mr. Matthews told me he wanted to take the matter further. I told Mr. Matthews that I would take the matter up with Mr. Michael Stuck, the Feed Mill Manager, my supervisor. I did not attempt in any way whatsoever to dissuade or discourage Mr. Matthews from taking the incident to Human Resources.

10.    I told Mr. Stuck about the incident involving Mr. Matthews and Mr. Betts. Mr. Stuck told me to refer the matter to Human Resources, which I did.

11.    On or about August 13, 2004, I attended a meeting in the Human Resources office. The subject of the meeting was the incident which involved Mr. Matthews and Mr. Betts. Present at the meeting was Mr. Glenn Anderson, the Director of Human Resources, Mr. Michael Stuck, the Feed Mill Manager, Mr. Matthews and Mr. Betts. Mr. Betts admitted placing coins in the air flow system (glad hands) of Mr. Matthews' vehicle. He stated he did so because twice in the week which preceded the event, Mr. Matthews deliberately cut him off the road and almost caused two (2) very serious accidents. Mr. Matthews denied deliberately cutting Mr. Betts off.

12.    As a result of the meeting which took place on August 13, 2004, Mr. Betts received a final warning advising him that any future violation of Company policies would result in disciplinary action up to and including discharge.

13.    On or about December 8, 2004 at 12:15 a.m., I received a telephone call at home from Mr. Robert Johnson, the Feed Mill dispatcher. Mr. Johnson is employed by Mountaire at the Millsboro, Delaware complex. Mr. Johnson is responsible for getting

3

the feed trucks loaded and dispatched to the farms where chickens owned by the Company are being raised by farmers.

14.    Mr. Johnson informed me on the night of December 8, 2004 that when he arrived at work the shuttles which cause chicken feed to be released from storage tanks into the feed trucks were not operating. This meant that feed could not be loaded into the trucks. Mr. Betts was on the scales trying to load his vehicle but he could not do so. Mr. Johnson told me he went to see what the problem was and that he had to check the breakers to see if that was causing the shuttles not to operate. At this time, Mr. Matthews approached Mr. Johnson and verbally assaulted him accusing him of "holding him up." Mr. Johnson told Mr. Matthews that the shuttles were not functioning and that he was trying to fix them. Mr. Matthews accused Mr. Johnson and Mr. Betts of holding him up. Mr. Matthews was in the dispatch office with Mr. Johnson when the call was made.

15.    Mr. Johnson fixed the problem with the shuttles. Mr. Johnson also told me that Mr. Matthews cowered over him while he was in the dispatch office and said to Mr. Johnson "somebody is going to get his freakin' head slapped." Mr. Johnson told me that he felt threatened by Mr. Matthews, that he was upset and was going to go home immediately. Mr. Johnson then put Mr. Matthews on the phone and Mr. Matthews continued to accuse Mr. Betts and Mr. Johnson of holding him up. I told Mr. Matthews that his accusation made no sense because all the drivers were delayed because of the shuttle problems.

16.    The following day I approached Mr. Matthews when he arrived at work and asked him what had happened on the previous evening. Mr. Matthews again said

4

that Mr. Betts and Mr. Johnson were trying to hold him up. I asked Mr. Matthews why he thought that Messrs. Betts and Johnson would try to hold him up. Mr. Matthews stated that he did not know. I then told Mr. Matthews that Mr. Johnson said that he had been threatened by Mr. Matthews. I told him Mr. Johnson claimed that he, Matthews, said to Johnson when they were alone in the dispatch office that "someone is going to get his freakin' head slapped." Mr. Matthews admitted that he had said words to that effect to Mr. Johnson. I told Mr. Matthews that if he did so I would have to report the matter to the Human Resources Department which I did later that day.

17.    On or about Monday, December 13, 2004, Mr. Matthews told me he was experiencing dizzy spells and would be absent from work for a few days. He also told me he had informed a nurse in the Medical Department about his dizziness. Mr. Matthews also told me he had an appointment with a neurologist on December 16, 2004. On December 14, 2004, Mr. Matthews gave me a note from the Medical Department stating he could return to work. I asked him if his dizzy spells were gone and he told me they were not.

18.    After receiving this information, I called the Medical Department and talked to Ms. Lori Cary, LPN, and asked her why Mr. Matthews was being allowed to return to work when he was still experiencing dizziness. Ms. Cary conferred with Ms. Claudia Pittman and, within a few minutes of my initial call, called me back and told me Mr. Matthews was not to leave the premises with his vehicle. I called Mr. Matthews and told him he could not return to work until he was cleared by the Medical Department.

5

I told him to report to the Medical Department and get instructions from them regarding what he should do next.

19.    Mr. Matthews returned to work on January 7, 2005 whereupon I suspended him for three (3) days pending the outcome of the investigation involving the threat he made to Mr. Johnson. I issued Mr. Matthews a disciplinary action form which he refused to sign. (Exh. 1). Mr. Johnson was instructed to call Mr. Pascual in the Human Resources Department on January 11, 2005. Mr. Matthews never called Mr. Pascual. Mr. Matthews was terminated effective January 11, 2005 for threatening Mr. Johnson, the dispatcher. (Exh. 2).

FURTHERMORE, THE AFFIANT SAYETH NOT.

I hereby declare under penalty of perjury that the foregoing nineteen (19) paragraphs are true and correct. Executed this ___26___ day of ___June___, 2007.

_____
Roland Lynch

Sworn to and subscribed before me
this _26_ day of _June_, 2007

_____
Notary Public

My Commission Expires: _2/7/2009_

#157678

6

**A00006**

# Mountaire
## Disciplinary Action Form
### *Notificación de Advertencia al Empleado*

Name: _Tim Matthews_    Date: _1-7-05_

Department: _Fee Comm... Sare Delivery_    Social Security #: _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_

Date of Hire: _3-24-03_

Work Rule/Policy:    _Use of threatening language_
*Política De La Compañía:*

Violation:    _Tim told an associate that "someone was going to_
*Violación:*    _get their head slapped"_

Action:    **ORAL        1ST        2ND        3RD**    _Final - Suspen_
*Acción:*    _Tim told an associate that "someone was going to get their
head slapped". Tim mentioned to Roland he is to Tim
admitting he said something to that effect. Company policy
clearly states that the use of threatening language
is not tolerated. Associate is suspended 3 days pending
an investigation which could lead to termination.
Tim is to call Al Pascual on Tuesday, 1-11-05, to find
out his status of his employment._

I have read this warning and understand the above violation. I understand that disregard of
company policies could result in disciplinary action up to and including discharge
*He leído la violación mencionada arriba. Entiendo que faltar a las políticas de la compañía
puede resultar en acción disciplinaria que podría incluir el despido.*

_Employee Refused to Sign_ _Roldan Uribe_    _1-7-05_
Employee Signature / *Firma del Empleado*    Date / *Fecha*

_Roland Lopez_    _1/7/05_
Supervisor Signature / *Firma del Supervisor*    Date / *Fecha*

_[signature]_    _1-7-05_
Human Resources Signature    Date

EXHIBIT
1

P:\Excel Forms\Corp\All\HR\100 - Disciplinary Action Form - 0398 - rev 1003.xls

_I Recievd No Call from Tim Matthews as of 5pm 1-11-05_

A00007

# MOUNTAIRE
## Hourly Termination of Employment

Date  Jan / 14 / 05

Employee Name  Tim Matthews

Social Security #  _____

Department Head  Mike Sturk           Date of Hire  3 / 24 / 03

Supervisor  Roland Lynch

Termination Date  1 / 11 / 05           Last Day of Work  12 / 10 / 04

Vacation Days Due  _____

Outstanding Loan?  Yes ☐  No ☑  If yes, amount owed by employee  $ _____

Reason for Separation:

Resigned ☐    Discharged ☑    Laid Off/Lack of Work ☐    Retired ☐

Please Explain Reason Checked  Threats To dispatcher

Give details relating to interview/rating at termination

| | Outstanding | More Than Satisfactory | Satisfactory | Needs Improvement | Unsatisfactory |
|---|---|---|---|---|---|
| Personal Qualities | | | | ✓ | |
| Job Knowledge | | | ✓ | | |
| Job Performance | | | | ✓ | |
| Dependability | | | | | ✓ |
| Initiative | | | ✓ | | |
| Judgement | | | ✓ | | |
| Cooperation | | | | | ✓ |

Did you have any problems supervising this employee?  Yes ☑ No ☐

Would you recommend this employee for rehire?  Yes ☐  No ☑

If NO, why?  Not Dependable

Supervisor  _____           Date  Jan 14/05

Human Resources Manager           A00008

EXHIBIT
2

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TIMOTHY MATTHEWS, | * | |
| | * | |
| Plaintiff, | * | Civil Action No. 06-330 |
| v. | * | |
| | * | |
| MOUNTAIRE FARMS | * | |
| OF DELAWARE, *et al.* | * | |
| | * | |
| Defendants. | * | |
| | / | |

### AFFIDAVIT OF WELLS BETTS

I, Wells Betts, state under oath as follows in support of the Defendants' Motion for Summary Judgment:

1.     I am over twenty-one (21) years of age and have personal knowledge of the facts/matters contained herein. My race is Caucasian.

2.     I am currently employed as a Feed Truck Driver at the Defendant's Frankford, Delaware Feed Mill. I began my employment with the Company in August of 2003, as a Feed Truck Driver and was initially assigned to the Company's Millsboro, Delaware Feed Mill.

3.     The feed trucks that I drove at the Millsboro, Delaware Feed Mill were 80,000 lbs. gross weight as are the feed mill trucks that I currently operate at the Frankford, Delaware feed mill.

4.     I know the Plaintiff, Mr. Timothy Matthews. He and I were both employed by the Defendant as feed truck drivers at the Company's Millsboro, Delaware feed mill. He and I both drove similar feed mill trucks, 80,000 lbs. gross weight.

5.       In the latter part of July 2004, I was returning to the feed mill after making a delivery at a farm North of Georgetown. Mr. Matthews was driving slowly in the right lane, southbound on Route 113 near the intersection of Governor Stockley Road. As I attempted to pass Mr. Matthews, he swerved into my lane, nearly causing an accident.

6.       Several days later, I was returning to the Millsboro Feed Mill. As I was leaving Millsboro, Mr. Matthews was approaching the stop sign at the end of Route 30. He ran the stop and pulled directly in my path. I had to lock down on the brakes to avoid a serious accident.

7.       After the second time that Mr. Matthews cut me off I placed two (2) quarters (.25) in the airline system, also known as the "glad hands," to the trailer brakes. By doing this, the trailer brakes will not release and the truck cannot move. I told another truck driver, Mr. James Wise, what I had done knowing that he would tell Mr. Matthews.

8.       A few days later, my immediate supervisor, Mr. Roland Lynch, approached me and asked me if I had placed the quarters (.25) in the air lines to Mr. Matthews' trailer. I admitted to Mr. Lynch that I had done so.

9.       On August 13, 2004 I was called into a meeting at the Human Resource Office. Present at the meeting was Mr. Glenn Anderson, the then Director of Human Resources, Mr. Michael Stuck, the Feed Mill Manager, Mr. Roland Lynch, my immediate supervisor, and the Plaintiff, Mr. Matthews. I admitted placing the quarters (.25) in the "glad hands" and stated I did so because of the two (2) near serious accidents that I could have been involved in when Mr. Matthews cut me off on the road. Mr. Matthews denied

2

cutting me off whereupon Mr. Anderson asked me to wait outside. Mr. Matthews remained in the Human Resource Office.

10.    After approximately one-half hour, Mr. Matthews came out of the Human Resource Office and I was asked to enter the office. I again stated that I placed the quarters (.25) in the airline system because Mr. Matthews had cut me off on two (2) separate occasions both of which almost caused an accident to occur. I also admitted that placing the quarters in the "glad hands" was not good judgment on my part and that I would never do anything like that again. The meeting ended shortly thereafter.

11.    I received a "Notice of Unacceptable Workplace Behavior and Final Warning" on August 16, 2004, whereupon I was warned that any future violations of Company policies would lead to further disciplinary action up to and including termination of employment. (Exh. No. 1).

12.    I have not violated any Company policy or rule since August 4, 2004.

FURTHERMORE, THE AFFIANT SAYETH NOT.

I hereby declare under penalty of perjury that the foregoing twelve (12) paragraphs are true and correct. Executed this 22nd day of JUNE , 2007.

_____
Wells Betts

Sworn to and subscribed before me
this 22 day of June , 2007

_____
Notary Public

My Commission Expires: 2/7/2009

#157608

3



*File*



**To:**    Wells Betts
**From:**  Mike Stuck
**Date:**  August 16, 2004
**Re:**    Notice of Unacceptable Workplace Behavior and Final Warning

On Friday, August 13, 2004 Glenn Anderson and I discussed an incident with you that occurred on August 4, 2004, where you admitted to placing two quarters in the "glad hands" of the airline system on feed delivery unit 4417, assigned to Tim Matthews. The placement of the quarters stopped air from traveling to the trailer, and the unit would not move because the brakes would not release. You stated *"I did it because Tim had cut me off earlier on the highway." "Tim pulled out in front of me on two occasions almost causing an accident."* You also stated that you knew this was misconduct and unacceptable behavior on your part.

Your action caused an approximate (15) fifteen-minute delay in Tim leaving the facility with his next load of feed.    You know and understand company policy regarding professional conduct, horseplay, and unacceptable behavior.

During our discussion concerning this incident, you stated, *"I placed the quarters in the glad hands. It was not good judgment on my part. I will never do anything like this again."*

As we discussed on Friday, August 13, 2004, your duties as an employee of Mountaire Farms of Delaware, Inc, including conducting yourself in a professional manner, and your dependability, is critical to maintaining our customers, and the success of our business. You know and understand the importance of the duties of your position. Your misconduct on August 4, 2004 is unacceptable workplace behavior by any employee, especially a driver, and cannot be tolerated by Mountaire.

Although your action regarding this incident is justifiable reason for the company to terminate your employment, the company has elected to issue to you written notice of Unacceptable Workplace Behavior and Final Notice. This notice will remain part of your file. This notice is intended to be corrective, and Mountaire sincerely hopes that you will not violate company policies in the future. As we have agreed, any further violation of company policies will subject you to further disciplinary action up to and including termination of employment.

As always, please ask for assistance with anything that you need. As Roland and I have discussed with you, we are dedicated to the success of Mountaire Farms of Delaware, Inc., and the success of each and every employee in the organization.

Sincerely,

Mike Stuck
Feedmill Manager

Acknowledgment:                                8.17.04
                Wells Betts                    Date

witness                          witness

**EXHIBIT**
1

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TIMOTHY MATTHEWS,        \*

                            \*

           Plaintiff,     \*     Civil Action No. 06-330

    v.                     \*

                            \*

MOUNTAIRE FARMS       \*

OF DELAWARE, *et al.*      \*

                            \*

          Defendants.   \*

_____/

### AFFIDAVIT OF CLAUDIA PITTMAN

I, Claudia Pittman, state under oath as follows in support of the Defendants'

Motion for Summary Judgment:

1.      I am over twenty-one (21) years of age and have personal knowledge of

the facts/matters contained herein.

2.      I am a Registered Nurse. I am currently employed by Mountaire Farms of

Delaware at its Millsboro, Delaware complex. I am the Medical Department Supervisor.

3.      On December 13, 2004, the Plaintiff, Mr. Matthews, called the medical

department and stated that he would not be in to work that day because he was sick. He

stated that he had a doctor's note and was told by a member of my staff to bring the note

in when he returned to work.

4.      Mr. Matthews returned to work on December 14, 2004 with a note from

Dr. Rosas stating that Mr. Matthews was suffering from lightheadedness and dizziness.

(Exh. 1). The note also stated that Mr. Matthews had an appointment on December 16, 2004 with a neurologist for further evaluation.

5.    Mr. Matthews was on a medical leave of absence one month earlier for lightheadedness and dizziness. October 27, 2004 to November 22, 2004.

6.    When Mr. Matthews returned to work on December 14, 2004, he told a member of my staff, Ms. Lori Cary, LPN, that he was still having dizzy spells. Ms. Cary called me at my home and explained the situation. I told her that we couldn't safely clear Mr. Matthews to drive a tractor trailer while having dizzy spells, and that he should keep the appointment with the neurologist on the 16th. I told him if the neurologist cleared him to return to work without restrictions, and he was not continuing to have dizziness, we could clear him to return to work. Mr. Matthews asked Ms. Cary to put in writing that we would not allow him to drive and she did so.

7.    Mr. Matthews attempted to return to work on December 16, 2004 and presented the Company with a second note from Dr. Rosas stating that he was cleared to return to work without restrictions. Mr. Matthews did not keep his appointment with the neurologist which he was unequivocally told to do before he could return to work. Mr. Matthews was told a second time that he could not return to work until he was cleared by the neurologist.

8.    On December 21, 2004, I received a note from the neurologist, Dr. Ahuja, stating that Mr. Matthews could return to work. (Exh. 2). It did not state whether he had any restrictions with regard to driving. The note stated to call Dr. Ahuja if we had any questions.

2

9.    Ms. Cary called and spoke directly to Dr. Ahuja.  He explained that

Mr. Matthews had a medical condition called BPPV; a particle floating loose in the inner

ear which can cause dizziness at any time. (Exh. 3).  Ms. Cary told Dr. Ahuja that

Mr. Matthews was a truck driver and drove an 80,000 lb. gross weight vehicle.

Dr. Ahuja stated that Mr. Matthews must pull the truck over if he got dizzy and not drive.

Ms. Cary called me at home and told me what Dr. Ahuja had said.  I told her that since he

drives a feed truck that weighs 80,000 lbs. loaded, I felt that the company doctor should

clear him, because he drives on many rural roads that do not have shoulders or safe

places to pull over, especially in a hurry. I was concerned for not only his safety, but the

safety of others on the road. I felt that he may need DOT clearance.

10.    On December 22, 2004, 8:30a.m., I called Milford Occupational Health*

and explained the situation and asked for guidance.  I talked to a person named Sherry,

who stated that she would consult the staff and call me back.  At 9:45 a.m., Sherry called

back and stated that Mr. Matthews would need a "Fit for Duty" exam before he could

return to work and scheduled it for January 6, 2005, their next available appointment. She

stated that the doctor would need all of his medical records related to his situation.  At

1:20p.m. on December 22, 2004, Mr. Matthews came into Medical and I explained that

he did indeed need a "Fit for Duty" exam according to Milford Occupational Health.  I

also told him that he needed to bring all records with him to the appointment on

_____

* Milford Occupational Health is the place where the Company sends all of its drivers for
their Commercial Driver's License physicals.

3

January 6. Mr. Matthews asked me to put this in writing and asked whose decision this was.

11.    I explained that I called Milford Occupational Health for guidance and was told that for his safety, he must be cleared by them. I put this in writing per his request. He asked if he could return to work after the physical. I told him that his work status was not up to me, but would be decided by the physician.

12.    On January 6, 2005, 10:40 a.m., I received a telephone call from Dr. Dilts, DO, Director of Occupational Health. He stated that he cleared Mr. Matthews because all symptoms had been resolved. He stated that he told Mr. Matthews that he was released to return to work full duty with no restrictions. I called Roland Lynch and told him Mr. Matthews was cleared to return to work, but if he came in, to send him to Medical to sign a "return from LOA" form. He stated he would. Mr. Matthews did not come in on January 6, 2005.

13.    On January 7, 2005, Mr. Matthews returned to work. He stated that the doctor told him to return to work on January 7, 2005. I had him sign his return form and sent a copy to the benefits department. He asked for copies of doctors notes at that time and I provided them.

4

FURTHERMORE, THE AFFIANT SAYETH NOT.

I hereby declare under penalty of perjury that the foregoing thirteen (13)

paragraphs are true and correct. Executed this 25th day of June , 2007.

Claudia Pittman, RN
Claudia Pittman

Sworn to and subscribed before me
this 25 day of June , 2007

Kim M Zuh
Notary Public

My Commission Expires: 2/7/2009

#157660

5

rec'd 12/14/04

DEA # _____

PRIMARY CARE
PRUDENCIO G. ROSAS, M.D.
BORISLAV S. ANTONOV, M.D
908 MIDDLEFORD ROAD
SEAFORD, DE 19973
302-629-9592

NAME _Timothy Matheus_____

ADDRESS_____ DATE _12_/_13_/_04_

**R** (Please Print)

Ex cuse patt from
wk on 12/13/04. Pt
may rt to wk on 12/14/04.
Pt has apt on 12/16/04
for further val.

Pt has any lightheadng/
dizziness Pt myt
on to to tu ASAP.

REFILL _____ TIMES _____

SUBSTITUTION PERMITTED

IF ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED, PRESCRIBER MUST HANDWRITE
'BRAND NECESSARY OR 'BRAND MEDICALLY NECESSARY' IN THE SPACE BELOW.

28-MAY-04

EXHIBIT
1

**Physicians Medical Practice. P.A.**
**Kanwaljit Singh Ahuja, M.D.**
**509 North Cannon Street**
**Bridgeville, DE-19933**

PH-302-897-2838

FAX-410-451-7271

Fax - 302-934-4029

TIMOTHY MATTHEWS  may

return to work. Please call c̄ questions.

K.Ahuja
for K.S. ANUJA
NEUROLOGY.
12/21/04




EXHIBIT
2

A00019

Physicians Medical Practice. P.A.
Kanwaljit Singh Ahuja, M.D.
509 North Cannon Street

PH-302-897-2838                     Bridgeville, DE-19933              FAX-410-451-7271

Fax - 302-934-4029

TIMOTHY MATTHEWS    may

return to work. Please call c questions.

B.P.P.V.

12/21/04                                        ½ Ahuja

Particle loose in inner       Dr K.S. AHUJA
ear = can cause dizziness      NEUROLOGY.
at any time. Per physician       12/21/04          4113
he has no restrictions. but
must pull Truck even          Roland / Lynch
when episode happens.
Per Claudia, he must be       Meclizine
seen by D.O.T. physician        Per
before he can drive. Appt
for doctor will be scheduled
tomorrow.

DOT
Jan 6th
9:00
MILFORD

A00020

EXHIBIT
3

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

TIMOTHY MATTHEWS,              *
                              *
              Plaintiff,       *        Civil Action No. 06-330
    v.                         *
                              *
MOUNTAIRE FARMS                *
OF DELAWARE, *et al.*           *
                              *
              Defendants.      *
_____/

**AFFIDAVIT OF ROBERT JOHNSON**

I, Robert Johnson, state under oath as follows in support of the Defendants'

Motion for Summary Judgment:

1.      I am over twenty-one (21) years of age and have personal knowledge of

the facts/matters contained herein.

2.      I am currently employed as a feed truck driver at the Defendant's

Millsboro, Delaware complex.  I have been employed by the Company since July 3,

1989.  From 2003 to 2005 I was employed as the Feed Mill Dispatcher for the Company

at the Millsboro complex.  In that capacity I was responsible for getting feed trucks

loaded and dispatched to farms where chickens owned by the Company are being raised

for ultimate processing at the plant.

3.      On or about December 8, 2004 at approximately 12:15 a.m., I called my

supervisor, Mr. Roland Lynch, at home report an incident which had occurred at the Feed

Mill.  I told Mr. Lynch that when I arrived at work the shuttles which cause chicken feed

to be released from storage tanks into the feed trucks were not operating. This meant that feed could not be loaded into the trucks. I told Mr. Lynch that Mr. Betts was on the scales trying to load his vehicle but he could not do so. I told Mr. Lynch that I went to see what the problem was and that I had to check the breakers to see if that was causing the shuttles not to operate. I told Mr. Lynch that at this time Mr. Matthews approached me and verbally assaulted me accusing me of "holding him up." I told Mr. Matthews that the shuttles were not functioning and that I was trying to fix them. Mr. Matthews accused me and Mr. Betts of holding him up. Mr. Matthews was in the dispatch office with me when I called Mr. Lynch. I fixed the problem with the shuttles. I also told Mr. Lynch that Mr. Matthews cowered over me while he was in the dispatch office and said to me in a very threatening way that "somebody is going to get his freakin' head slapped." I told Mr. Lynch that I felt threatened by Mr. Matthews, that I was upset and was going to go home immediately. I then put Mr. Matthews on the phone and Mr. Matthews continued to accuse Mr. Betts and me of holding him up.

4.    I left the dispatch office and went to my car to go home. I then realized that if I left it would take Mr. Lynch some time to get to work and dispatch the drivers so I calmed myself down and went back to the dispatch office. I called Mr. Lynch back and told him I would work out the shift.

FURTHERMORE, THE AFFIANT SAYETH NOT.

2

A00022

I hereby declare under penalty of perjury that the foregoing four (4) paragraphs

are true and correct. Executed this 25 day of June , 2007.

Robert Johnson

Sworn to and subscribed before me
this 25 day of June , 2007

Notary Public

My Commission Expires: 2/7/2009

#157660

3

**A00023**

# EXHIBIT E



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
The Windsor
24 N. W. Front Street
Suite 100
Milford, DE 19963

Telephone: (302) 422-1134
Fax: (302) 422-1137

September 5, 2005

Alberto A. Pascual, Jr.
DA HR Manager
Mountaire Farms of Delaware, Inc.
P.O. Box 1320
Millsboro, DE 19966
**RE:    Matthews v. Mountaire Farms of DE; 04120905/17CA500152**

Dear Mr. Pascual:

As you are aware I am the assigned investigator for the above reference employment discrimination complaint that was filed with this agency. Based on the review of the information provided thus far in the investigation, additional information is required from Respondent.

    1)      Provide a copy of Respondent's policy/procedures for disciplinary actions.
    2)      Provide a copy of Charging Party entire personnel file and medical file.

Charging Party contends that he was discharged on or about January 19, 2005 for allegedly making threatening comments. Charging Party contends that his discharge was in retaliation for filing the above listed complaint against Respondent. Respondent received the charge of discrimination on January 12, 2005, if indeed Charging Party was discharged on January 19, 2005 the proximity in events is suspicious; however, this agency recognizes any employer's right to discipline/discharge employees for legitimate non-discriminatory reasons. Therefore, provide a status report on Charging Party's employment disposition and if he was discharged provide all documentation that was generated as a result of Respondent's decision to discharge Charging Party and a detailed explanation for Respondent's decision.

Respondent may have until September 21, 2005 to provide the specific requested information and any additional relevant information that would further this investigation. If Respondent can not provide a substantive and substantiated legitimate non-discriminatory for its actions in discharging Charging Party, if indeed he was discharged, a cause finding could occur.

Very truly yours,

Trina R. D. Wheedleton
Labor Law Enforcement Officer II

A00024