UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TIMOTHY MATTHEWS,                        *
                                        *
        Plaintiff,                      *  Civil Action No. 06-330 GMS
                                        *
                                        *
v.                                      *
                                        *
                                        *
MOUNTAIRE FARMS OF                      *
DELAWARE, INC. et al.,                  *

        Defendants.


### PLAINTIFF'S OPENING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Maggie Clausell
LAW OFFICE OF MAGGIE CLAUSELL, LLC
9 E. Loockerman Street, #205
Dover, DE 19901
302-678-7644 (voice)
302-678-0771(fax)

*Attorney for Plaintiff*

DATE: November 9, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................... iii

NATURE AND STAGE OF PROCEEDINGS.................................... 1-2

SUMMARY OF ARGUMENT.............................................................. 3-5

STATEMENT OF UNDISPUTED FACTS............................................ 6-8

ARGUMENT...................................................................................... 9-18

A.    Standard for Summary Judgment Under Rule 56........................ 9-10

B.    Plaintiff Can State a Claim for Retaliation in Violation of
      Title VII of the Civil Rights Act of 1964.................................... 10-19

      1.    Plaintiff Engaged in Protected Activity When He Complained
            To Mountaire Farms and the Department of Labor About
            Discrimination at Mountaire Farms...................................... 10-12

      2.    Plaintiff Suffered an Adverse Employment Action As a
            Result of His Protected Activity........................................... 12-13

      3.    There was a Causal Connection Between Plaintiff's
            Protected Activity and His Adverse Employment
            Action ............................................................................... 13-16

C.    Mountaire Farms Declared Reason For Termination Of
      Plaintiff Is Pretext And Was In Retaliation For His Protected
      Activity............................................................................................ 16-18

D.    The Plaintiff Concedes That There Is No Private Right Of Action
      Under 19 Del. C. § 711 And Under OSHA..................................... 18

E.    The Plaintiff Concedes That The Plaintiff Has No Cause Of Action
      Against Defendants Betts, Pascual, Pittman, Carey
      And Mitchell ................................................................................... 18

CONCLUSION........................................................................................ 19-20

# TABLE OF AUTHORITIES

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)...........…….................................9

*Bausman v. Interstate Brands Corp.* 252 F.3d 1111 (10th Circ. 2001)......................17

*Burlington N. & Santa Fe Ry. Co. v. White,* 126 S. Ct. 2405
(2006)................................................................................................................... 7, 12, 13

*Chiaramonte v. Fashion Bed Group, Inc.,*
129 F.3d 391 (7th Cir. 1997)...............................................................................................9

*Krouse v. Am. Sterilizer Co.,* 126 F.3d 494 (3rd. Cir. 1997)................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574 (1986)....................9

*Marra v. Philadelphia Housing Authority,* 497 F.3d 286 (3rd Cir. 2007)............17, 17

*McDonnell Douglas Corp. v. Green,* 422 U.S. 792 (1973)................................................11

*Pastran v. K-Mart Corp.,* 210 F.3d 1210 (10th Circ., 2000). .............................................17

<u>Statutes</u>

42 U. S. C. §2000e-3, *et seq.*.........................................................................................................1

19 <u>Del.</u> <u>C.</u> § 711................................................................................................................1, 18

<u>Rules</u>

Fed. R. Civ. P. 56.........................................................................................................................9

## NATURE AND STAGE OF PROCEEDINGS

On December 18, 2006, Plaintiff Timothy Matthews filed an amended complaint alleging that Defendants violated the Title VII of the Civil Rights Act of 1964, as amended, 42 USCA § 2000e-3 *et seq*. when it terminated his employment. Plaintiff also claims that Defendants violated the Occupational Safety and Health Act of 1970, 19 U.S.C. § 651 *et seq*. and the Delaware Discrimination in Employment Act, 19 Del. C. § 711.

Plaintiff asserts that his termination was in retaliation for complaining about the racial discrimination after a white employee tampered with the brake line of a vehicle he drove for Mountaire Farms. Wells Betts, a white employee, bragged that he inserted coins into the brake line of the vehicle Plaintiff drove for Mountaire Farms. Plaintiff's supervisor and the management of Mountaire Farms took no steps to determine who sabotaged the vehicle. After Plaintiff determined that Betts sabotaged the vehicle, he reported the same to his supervisor. The supervisor took no action against Betts for approximately three weeks. Mountaire Farms subsequently designed a special process for handling the Betts matter. Betts was not suspended or terminated, and suffered no loss of pay or other job benefits. His discipline was a mere warning for tampering with the brake lines of the 80,000 lb gross weight vehicle Plaintiff drove for Mountaire Farms.

Plaintiff alleges that in retaliation for his complaint about the tampering incident, and his continuing complaints about the lenient discipline meted out to Betts, Defendants orchestrated a retaliatory plan against him. The plan included preventing him from driving his vehicle, placing him on short-term disability with a

1

reduction in pay with no designation of the disabling condition, denying him any light duty work around the feed mill, and finally terminating him on the pretext that he threatened another employee.

Defendants filed a Motion for Summary Judgment and Plaintiff files this brief in opposition to that Motion.

2

## SUMMARY OF ARGUMENT

1.    At the time when this cause of action arose, Plaintiff was employed as a truck driver for Mountaire Farms of Delaware.  He operated a vehicle of 80,000 pounds gross weight.

2.    Plaintiff alleges that Defendant Mountaire Farms of Delaware tolerated a hostile work place based on racial animus and retaliated against him for complaining about the racially motivated misconduct of another employee.  Wells Betts, a white employee of Mountaire Farms admits that he sabotaged the 80,000 lb. gross weight vehicle operated by Plaintiff.  Before Betts publicly admitted that he tampered with the Mountaire Farms vehicle drove by Plaintiff, Roland Lynch, who supervised both Betts and the Plaintiff, promised that whoever committed the act would be terminated.  Plaintiff alleges that Mountaire Farms took no affirmative steps to discover who sabotaged the vehicle, failed to report it to the company safety officer as required by company policy, and after Betts bragged of his conduct, Lynch failed to discipline Betts for this action because Betts and Lynch were good friends.  Plaintiff repeatedly complained to Lynch that Betts had not been disciplined for his conduct.  Instead of firing Betts for his conduct as he had promised to do, Lynch and the Human Resources unit of Mountaire Farms designed a special and disparate process for handling the Betts matter.  Betts was not terminated for his reckless and outrageous conduct, but was only issued a disciplinary warning.

3.    Plaintiff believed that the sanction against Betts was inadequate, and would not be an effective deterrent against such conduct in the future.  Plaintiff

3

continued to complain to Mountaire Farms management about Mr. Betts' dangerous and reckless actions, and the lack of meaningful discipline.

4.    After Plaintiff took a sick leave day in December, Defendants refused to accept three doctors' notes of medical clearance to return to work. When Defendants insisted that Plaintiff be seen by its company physician, Plaintiff complied, but the appointment was set for early January 2005 when earlier appointments were available. Plaintiff was placed on short-term disability and his income dropped by approximately $170.00 a day. Plaintiff was not offered any light duty work which would have kept him employed. Defendants deliberately orchestrated events so that Plaintiff would lose income during the period when he was waiting to see the company physician. This was also the holiday season, making it especially hard for the Plaintiff to provide for his family.

5.    After Plaintiff complied with Defendants requests, and provided four medical clearances to return to work, on his first day of return to work, he was summarily terminated by Roland Lynch for allegedly threatening another employee. While Lynch seemed puzzled as to what to do when Betts sabotaged a company vehicle, and asked Plaintiff what did he want him to do, he was decisive in his termination of Plaintiff for allegedly directing the following comments to no one specifically: "someone is going to get their freaking head slapped". Moreover, Mountaire Farms used different processes for disciplining Betts and Plaintiff. The record does not suggest that Plaintiff was ever afforded an opportunity to be heard on the incident for which he was allegedly fired.

6.     Mountaire Farms tolerated a hostile work environment based on racial animus.  The Defendant failed to take any steps to determine who sabotaged an 80,000 lb gross weight vehicle driven by a black employee, failed to discipline the offending employee until Plaintiff complained, and set up a disparate disciplinary procedure for dealing with the offending white employee.  The Defendant failed to terminate the white employee for serious and reckless misconduct that endangered Plaintiff and innocent motorists.

7.     The white employee who engaged in what Defendants now jokingly refer to as a "prank" was not even suspended and never lost any pay or other benefits. However, Plaintiff was terminated for allegedly threatening another employee when he is alleged to have uttered the statement, "someone is going get their freaking head slapped", and was not extended any of the process made available to Betts.  Plaintiff was terminated in retaliation for complaining about Betts' racially motivated conduct, and for his continued complaints about the lack of meaningful sanctions against Betts for this reckless and racist conduct.

## STATEMENT OF UNDISPUTED FACTS

1.      It is undisputed that on August 15, 2004, Wells Betts, a white employee of Mountaire Farms tampered with the brake lines of the vehicle Plaintiff was assigned to drive for Mountaire Farms by placing coins in the airflow system.

2.      It is undisputed that Plaintiff found out who tampered with vehicle, reported it to management in the person of Roland Lynch and for three weeks, management took no steps to discipline Wells Betts.

3.      It is undisputed that when Plaintiff questioned Roland Lynch about the matter, Lynch responded by asking Plaintiff, "...what is that you want me to do about it". It is undisputed that Roland Lynch told Plaintiff that "...if it were me, I would forget about it and go about my business".

4.      It is undisputed that instead of immediately terminating or even disciplining Betts for his conduct, Mountaire Farms set up a special process for investigating and disciplining Betts which included a meeting of Betts, Lynch, Plaintiff, Michael Stuck, Feed Mill Manager, and Gary Anderson, Director of Human Resources.

5.      It is undisputed that after Plaintiff was alleged to have made the statement that "someone is going to get their freaking head slapped", Lynch used a different process by investigating and disciplining Plaintiff. Specifically, Lynch summarily terminated Plaintiff for an "alleged threat" while Betts was issued only a warning for tampering with and sabotaging a Mountaire Farms vehicle.

6.      It is undisputed that after complaining to Mountaire Farms about the Betts sabotage of the vehicle he drove, Plaintiff was subjected to disparate process for dealing with employees returning from sick leave. Instead of using the

procedures outlined in its employee handbook (Plaintiff's Exhibit 1) , Mountaire Farms required Plaintiff to obtain four medical clearances before returning to work.

8.    It is undisputed that Defendant Mountaire Farms refused to give Plaintiff any light duty work around the feed mill.

9.    It is undisputed that Plaintiff was placed on short-term disability and experienced an 80% reduction in pay after complaining about Betts' sabotage of the vehicle he drove for Mountaire Farms.

9.    Contrary to Defendants' assertion in their opening brief in support of the Motion for Summary Judgment (D.I. 18, Page 7, ¶1), the return to work doctor's excuse of December 13, 2004 makes no reference to a neurologist visit (Plaintiff's Exhibit 2).  The note states that the patient was scheduled for a follow up visit on December 16, 2004 which he kept.

10.    Claudia Pittman directed that Timothy Matthews could not drive or return to work until such time he was medically cleared by a neurologist. (Plaintiff's Exhibit 3)

11.    It is undisputed that just one day after Plaintiff received all the medical clearance required of him, he was terminated for allegedly threatening another employee in an incident that occurred on or about December 7 or 8, 2004.

12.    Under Burlington Northern, whether the Plaintiff suffered materially adverse job actions when he was placed on short-term disability with a reduction in pay during the holiday season, required to visit four doctors before he could

7

return to work, and ultimately terminated are questions for a jury to decide.  In

Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2406 (2006).

13.     The Plaintiff requests that the Court deny Defendants' Motion for Summary

Judgment and allow the case to proceed to trial.

## ARGUMENT

A.    **SUMMARY JUDGMENT SHOULD BE GRANTED IF THERE IS NO GENUINE ISSUE AS TO ANY MATERIAL FACT AND THE MOVING PARTY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW**

Federal Rule of Civil Procedure 56 provides for the entry of summary judgment when:

"..the pleadings, depositions, and answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56, Federal Rules of Civil Procedure.

A genuine issue of fact exists "... if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed2d 202 (1986). The burden of proving that there is no issue of material fact remains with the moving party. The Court must examine all the evidence in a light most favorable to the non-moving party. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and the moving party is entitled to judgment as a matter of law. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S., 574, 587 (1986).

To avoid summary judgment, a plaintiff must offer "concrete evidence from which a reasonable trier could fact could return a verdict in his favor. Anderson, 477, at 256.

In the case at the bar, there are several issues of material fact, including the following:

1.    Did Mr. Lynch make the final decision with regard to the hiring and firing of Plaintiff such that Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391,

9

399 (7th Circuit, 1997) is applicable in this case as cited in Defendants brief for Summary Judgment, and there is a presumption of non-discrimination.  Mr. Lynch asserts in his affidavit that he hired and fired the Plaintiff, but the other than his claim there is no evidence in the record to support this claim.

2.    Did Mountaire Farms have any conversations with the Department of Labor notifying it of Plaintiff's discrimination complaint prior to receipt of the January 6, 2007 charging letter such that Defendants knew that Plaintiff had filed a complaint alleging discrimination and a hostile workplace prior to his termination?

3.    Did Mountaire Farms have knowledge that Plaintiff had filed a police report against Wells Betts prior to its termination of Plaintiff?

4.    Did Mountaire Farms ignore the hostile work environment and racial animus towards Plaintiff as suggested by Lynch's affidavit when he  told the Plaintiff, if it were him, he would "forget about it and go about my business". (D.I. 20, Exhibit A, Lynch Affidavit, ¶9).

5.    Did the December 14, 2004 return to work note mention that the Plaintiff had an appointment with a neurologist on December 16, 2004?  If it did not, as Plaintiff contends, Defendants assertion that Plaintiff delayed seeking medical attention and prolonged his time on disability pay is incorrect.

6.    Did Milford Occupational Health have earlier appointment slots available so that Plaintiff could have been seen earlier and returned to work earlier than January 7, 2005?

7.    Was the manner of Plaintiff's termination inconsistent with company policy?

8.    Did Plaintiff suffer materially adverse job actions such that the <u>Burlington Northern</u> is applicable and the jury should be trier of fact?

**B.    PLAINTIFF CAN STATE A CLAIM FOR RELATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

**1.    Plaintiff Engaged In Protected Activity When He Complained To Mountaire Farms And The Department Of Labor About Discrimination At Mountaire Farms.**

A plaintiff will succeed in making a *prima facie* case of retaliation if he can

prove that 1) he engaged in a protected activity; 2) he suffered an adverse

10

employment action and 3) there was a causal connection between the protected

activity and the adverse employment action. (McDonnell Douglass Corp. v.

Green, 411 U.S. 792, 802-804, 1973).  In this case, Plaintiff was worked in a

racially hostile environment, and complained of the racially motivated sabotage of

the vehicle he drove.  Defendant Mountaire Farms took no action on Plaintiff's

complaint for three weeks.  Plaintiff continued to complain to his supervisor.

Plaintiff's supervisor attempted to dissuade his complaints when he told Plaintiff,

if it were him, he would "forget about it and go about my business". (D.I. 20,

Exhibit A, Lynch Affidavit, ¶9).

When Defendant Mountaire Farms did investigate Betts' sabotage of

Plaintiff's vehicle, it set up a special procedure to investigate the misconduct.  Mr.

Betts was given a mild disciplinary warning after having an opportunity to present

his case before the Human Resources Director.  Plaintiff continued to complain

about the mild sanction against Betts and the racially hostile work environment

until he was terminated.

Plaintiff's complaint about Betts' racially motivated conduct was a

protected activity.  Defendants argue that Plaintiff's internal complaint was about

safety, not discrimination.  Plaintiff concedes that he was concerned about his

safety.  However, if not for Betts' racially motivated conduct, and Mountaire

Farms willingness to tolerate a racially hostile workplace, Plaintiff would have no

cause for a complaint in discrimination or safety.  When Plaintiff complained to

Roland Lynch, Lynch told him that if it were him, he would "forget about it and go

about my business". (D. I. 20, Exhibit A, Lynch Affidavit, ¶9). Plaintiff's internal

complaint to management was about racially motivated conduct that endangered his safety as well as that of others.  Racially motivated misconduct often has objective expression as threats of physical harm, emotional abuse, or barriers to employment opportunities.  In this case, the objective outcome of Betts' racially motivated misconduct was a threat to Plaintiff's personal safety.

Plaintiff's subsequent complaints to management about the lack of meaningful sanctions against Betts and the racially hostile work environment were motivated by his concerns that the sanction meted out to Betts was an inadequate deterrent to future racially motivated threats to his safety.

Plaintiff's OSHA related claims, as well as his eventual reporting of the incident to the police reflected his frustration with Defendants' failure to provide meaningful redress to his internal complaint.  Plaintiff delayed in reporting the incident with the expectation that Mountaire Farms would address Betts' misconduct.

2.    **Plaintiff Suffered An Adverse Employment Action As A Result Of His Protected Activity**

In Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2406 (2006), the Court held that the anti-retaliation provision of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2003e-3(a):

> does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace...
> [and] that the provision covers those (and only those) employer actions which would have been materially adverse to a reasonable employee or job application ..[t]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.

12

In this case, Plaintiff suffered three adverse actions because of complaining about a racially hostile work environment, Betts' racially motivated misconduct, and the lack of meaningful sanctions against Betts. He was placed on short-term disability for 24 days at 80% of his regular pay. He was not offered any light duty work in the feed mill that would have prevented the precipitous decline in his income at the holiday season. He was required to submit four medical clearances after being off work on sick leave for one day.

Ultimately, the Plaintiff was terminated on the pretext that he threatened another employee and spent a period of time collecting unemployment compensation before securing another position. Defendant opposed the award of unemployment compensation benefits to the Plaintiff, but an unemployment appeals referee ultimately found for Plaintiff.

Under Burlington Northern, whether these employer actions are so materially adverse as to dissuade a reasonable worker from making a charge of discrimination is a question most properly before a jury.

### 3.    There Was A Causal Connection Between Plaintiff's Protected Activity And His Adverse Employment Action.

Defendant asserts that Plaintiff was not terminated in retaliation for complaining about the racially motivated conduct of Betts and Mountaire Farms' failure to impose meaningful sanctions on him. Defendant asserts that Plaintiff was terminated for threatening another employee.

Mountaire Farms asserts that on or about December 7 or 8, 2004 Plaintiff made the statement, "someone is going to get their freaking head slapped".

13

Plaintiff denies that he ever made that statement or ever threatened any employee (Plaintiff's Exhibit 5, ¶ 5). Plaintiff asserts that the claim is pretext to cover Defendants' retaliatory termination of Plaintiff for engaging in a protected activity.

In reversing the initial denial of Plaintiffs unemployment compensation benefits, the appeals referee noted that Defendant Mountaire Farms had no written policy on threatening words (Plaintiff's Exhibit 4, p.2, ¶2), and that if Plaintiff made the remarks, there was no way to know who he was referring to when he uttered those words  (Plaintiff's Exhibit 4, p.5, ¶4).

Plaintiff worked for Defendant Mountaire Farms for about twenty-one months at the time of his termination.  He had no violations or disciplinary warning at the time of his termination.  Even if Plaintiff had other violations, under a progressive discipline system, it is questionable as to whether Plaintiff would be terminated.  It is possible that the threat of physical violence would be the grounds for immediate termination if Mountaire Farms had a zero tolerance policy of such behavior.  However, as determined at the Plaintiff's unemployment compensation appeal hearing, Mountaire Farms does not have a written policy on the use of threatening words in the workplace. (Plaintiff's Exhibit 4, p.2, ¶2).

Plaintiff was on short-term leave from the period of December 14, 2004 to January 7, 2005 when he was fired.  From the period management claimed to have learned of the incident to his termination, no one in management ever questioned Plaintiff about the incident.  This treatment should be contrasted with

14

the extraordinary deference and special process accorded to Betts after he admitted to sabotaging the vehicle Plaintiff drove for Defendant Mountaire Farms.

When Plaintiff complained to Lynch about Betts' racially motivated conduct, Lynch told him "if it were me I would forget about it and go about my business". (D.I. 20, Exhibit A, Lynch Affidavit, ¶9). Lynch further stated in his Affidavit that he told Plaintiff that it was up to him to decide what he wanted done. (D.I. 20, Exhibit A, Lynch Affidavit, ¶9).  This approach is inconsistent with Lynch's response to the allegation that Plaintiff used threatening language against another employee.  Lynch told Plaintiff that he would have to report the matter to Human Resources. (D.I. 20, Exhibit A, Lynch Affidavit, ¶16).

As described in the Plaintiff's amended complaint, (D. I. 13, ¶33), Mountaire Farms had no written policies regarding the use of threatening words in the workplace.  It was the practice of Defendant Mountaire Farms to suspend an employee prior to termination (D. I. 19, p. 22, ¶ 1).  It was not company policy to terminate any employee on the spot.  However, this is exactly what happened to the Plaintiff.  As outlined in the Plaintiff's Amended Complaint (D .I.13, ¶¶ 33-34), Mountaire Farms terminated Plaintiff's employment without following any of the company procedures for terminating employees.

If the Court agrees accepts Defendants' assertion that it did not know of Plaintiff's discrimination claim with the Delaware Department of Labor and that the police report does not evidence good faith, the Plaintiff still made a valid internal complaint with his supervisor and other managers at Mountaire Farms

15

so that there is temporal proximity between the making of his complaint and his termination.

## C.    MOUNTAIRE FARMS DECLARED REASON FOR TERMINATION OF PLAINTIFF IS PRETEXT AND WAS IN RETALIATION FOR HIS PROTECTED ACTIVITY.

Defendants allege that Plaintiff was terminated because he made threatening remarks against another employee. Plaintiff has denied that he threatened another employee (Plaintiff's Exhibit 5). Further, if Plaintiff did make the remark he is alleged to have made, it is non-specific and does not appear to be directed at any person in particular. From the remark, it is unclear that Plaintiff is even referring to someone on the Mountaire Farms property.

Defendants have not produced any written evidence that Mountaire had a zero tolerance for threatening words. It produced no evidence that Plaintiff had participated in company training on threats of violence in the workplace so that Plaintiff would have known that the phrase, "someone is going to get their freaking head slapped" would have been threatening under company policy.

Mountaire Farms does not have a written policy on threatening words in the work place. Even if Plaintiff uttered the phrase which has been attributed to him, there is no evidence that the use of the words violated any company policy or that the Plaintiff had ever been given a warning about the use of such language in the workplace.

If the Plaintiff did in fact utter the phrase which has been attributed to him, his discipline was much more severe than that of Betts who was given a mere warning for sabotaging an 80,000 lb gross weight vehicle. The inconsistency in

16

the application of company rules had been found to suggest that the proffered reason for the adverse employment action is pretextual and unworthy of credence.  Bausman v. Interstate Brands Corp. 252 F.3d 1111 (10th Circ. 2001); Pastran v. K-Mart Corp., 210 F.3d 1210 (10th Circ., 2000).  Pretext may be shown by exposing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence".  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 504 (3rd. Cir. 1997).

Defendants allege that there actions against Plaintiff were motivated by concerns for safety in the workplace.  The disparate treatment of Betts belies this assertion.  Defendant's claims that Betts conduct did not endanger anyone.  There is no statement in Lynch's affidavit which would suggest that he is an expert in the mechanics of vehicles such as the one in question.  Expert opinion should be presented to establish that Betts conduct did not endanger Plaintiff or Delaware motorists.  Racial discrimination and retaliation are the only logical reasons as to why Plaintiff was terminated for allegedly making an innocuous statement and Betts was retained in view of his egregious conduct.  Disparate treatment of employees can support an inference that the Defendants' explanation for termination was pretextual.  Marra v. Philadelphia Housing Authority, 497 F.3d 286, 307, (3rd Cir. 2007).

Defendants assert that the firing of Plaintiff could not be retaliatory since it did not know that Plaintiff had filed a discrimination complaint with the Delaware Department of Labor when it terminated Plaintiff, and that the complaint to the

17

police was not filed in good faith.  If Defendants' claims about these two activities

are correct, the Defendant still is retaliating for the initial complaints Plaintiff made

with Lynch and other Mountaire Farm managers about Betts' racially motivated

conduct, the lack of meaningful sanctions against him, and the continuing racially

hostile workplace.

D.     The Plaintiff Concedes That There Is No Private Right Of Action Under 19
       Del. C. § 711 And Under OSHA.

The Plaintiff concedes that the Plaintiff has no private right of action under

the above referenced statutes.  However, at the filing of the pro se complaint and

amended complaint, Plaintiff had a good faith belief that a private right of action

was available under these statutes.

E.     The Plaintiff Concedes That The Plaintiff Has No Cause Of Action Against
       Defendants Betts, Pascual, Pittman, Carey And Mitchell.

The Plaintiff concedes that the Plaintiff has no cause of action against the

above named Defendants under Title VII of the Civil Rights Act of 1964, as

amended, 42 USCA § 2000e-3 *et seq*.  However, at the filing of the pro se

complaint and amended complaint, Plaintiff had a good faith belief that the above

named Defendants were liable for their role in discriminating against the Plaintiff,

placing additional burdens on him with respect to obtaining medical clearances,

and in his termination.

18

## CONCLUSION

A white Mountaire Farms employee tampers with the brake lines of an 80,000 lb. gross weight truck driven by a black Mountaire Farms employee, the Plaintiff. After the black employee complains to his supervisor, he is told to forget about it and go about his business. After repeated complaints, white employee is given a hearing before the Director of Human Resources. Three weeks after the incident, white employee is given a mild disciplinary warning. He is not terminated, suspended, nor does he lose any pay or any other job benefits. Soon thereafter, Black employee is put on short-term disability for 24 days during the Christmas holiday season with an 80% pay reduction after being out on sick leave for one day. He is required to present four medical clearances before being allowed back to work on January 7, 2005 at which time he is summarily terminated for allegedly saying, "someone is going to get his freaking head slapped". He is not given a hearing. He is never questioned about the matter. Defendants allege that their actions were motivated by concern for Plaintiff's safety as well as that of the public. This is completely inconsistent with Defendants' actions and attitude towards Wells Betts when he tampered with the Plaintiff's brake line. It is incredulous that Defendant Mountaire was motivated by safety concerns over Plaintiff's alleged remarks when it took no meaningful actions against Wells Betts.

The Defendants now motion for a Summary Judgment because they allege there is no genuine dispute of any material fact.

19

In response, the Plaintiff has shown that he engaged in a protected activity, he suffered materially adverse job actions, and there was a causal nexus between his protected activity and his termination.  Moreover, many material facts are in dispute.  For the foregoing reasons, Plaintiff prays the Honorable Court to deny Defendants' Motion for Summary Judgment and allow the case to proceed to trial.

LAW OFFICE OF MAGGIE CLAUSELL, LLC,

Maggie Clausell, Esq.
Bar ID #4532
9 E. Loockerman Street, Ste. 205
Dover, DE 19901
302-678-7644 (voice)
302-678-0771 (fax)

Attorney for Plaintiff

November 9, 2007

20

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TIMOTHY MATTHEWS,                          *
                                           *
          Plaintiff,                       *
                                           *  Civil Action No. 06-330 GMS
                                           *
                                           *
v.                                         *
                                           *
                                           *
MOUNTAIRE FARMS OF                         *
DELAWARE, INC. et al.,                     *
                                           *
          Defendants.

## APPENDIX TO PLAINTIFF'S OPENING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Maggie Clausell
LAW OFFICE OF MAGGIE CLAUSELL, LLC
9 E. Loockerman Street, #205
Dover, DE 19901
302-678-7644 (voice)
302-678-0771(fax)

*Attorney for Plaintiff*

DATE: November 9, 2007

## TABLE OF EXHIBITS

| PAGE | TITLE | TAB |
|------|-------|-----|
| A00001 | MOUNTAIRE MEDICAL LEAVE POLICY-EXHIBIT 1 | 1 |
| A00002 | EXHIBIT 2-SEALED DOCUMENT | 2 |
| A00003 | EXHIBIT 3-SEALED DOCUMENT | 3 |
| A00004 | UIC APPEAL HEARING REFEREE REPORT | 4 |
| A00005 | PLAINTIFF'S AFFIDAVIT-EXHIBIT 5 | 5 |

EXHIBIT 1

AOOOO1

The following days are not counted as absences:

| | | |
|---|---|---|
| Approved Personal Leave | Court Subpoena | Lay Off |
| Approved Medical Leave | Military Leave | PTO Days |
| Appt. w/Probation | Worker's Comp. | Holidays |
| Immigration Reporting | Jury Duty | Vacation |
| Bereavement Leave | | |

Days in which management allows your department to leave early due to lack of work or acts of nature.

A non-medical, five-day absence equals two occurrences; one for the first three days, the second for day four and five. If the unpaid leave qualifies under the Family Medical Leave Act, no occurrence will be given.

## Illnesses

Illnesses like the flu, colds and viruses that are five days or less will be treated as one illness and one occurrence will be given. If these types of illnesses extend into the second week, or after the 5th workday, a medical leave of absence will be considered by the Medical Department.

A doctor's note is required when you are absent for three consecutive days. A five-day medical absence equals one occurrence. When absent due to medical reasons, the employee must call the Medical Department at 302-934-3018 and inform them how long he/she will be out of work. This notification must take place within 24 hours of visiting the doctor and issuance of his/her recommendation. The Medical Department will in turn notify Human Resources of an employee's status in a timely matter.

No absences will be charged to an employee on the day he/she is sent home by Mountaire Medical Personnel.

If an employee leaves for medical reasons, he/she must make an appointment with a doctor within 24 hours and notify the Medical Department within the same period. The appointment will be verified by Medical or Human Resources.

Mountaire reserves the right to have an employee see the Company doctor if an illness or medical problem seems to be recurring.

When absent due to medical reasons, the employee must produce a note from the attending doctor stating their expected date to return to work. This note must be conveyed to Human resources through the Medical Department.

No leave of Absence will be granted during the first 90 days of employment.

## Notification

Employees should attempt to contact their Supervisor before start of their shift. If you cannot reach him/her directly, contact the Human Resources Department. The individual is responsible for his/her attendance record and making sure the supervisor is aware of each day of an absence.



*Mountaire Farms of Delaware, Inc.*        **Hourly Driver Benefits Orientation**

EXHIBIT

PAGES        3024243713        3024243713        MS.  OHARA- JONES 3024243713     01:10 2007-50-11

P.002                     11/06/2007 00:08            RX Date/Time

EXHIBIT 2

EXHIBIT

Sealed

A00002

EXHIBIT 3

A00003



EXHIBIT 4

A00004



DIVISION OF UNEMPLOYMENT INSURANCE
APPEALS
4425 N. MARKET STREET
P. O. BOX 9950
WILMINGTON, DE 19809

## REFEREE'S DECISION

**CLAIMANT**

Timothy C. Matthews

**APPEAL DOCKET NUMBER:** 731505

**SOCIAL SECURITY NO.:**

**DATE OF CLAIM:** 12/12/2004

**DATE OF APPEAL:** 1/25/2005

**DATE OF HEARING:** 2/9/2005

**EMPLOYER**

Mountaire, Inc.
Attn: Personnel
P.O. Box 1320
Millsboro, DE 19966

**PLACE OF HEARING:** Georgetown

**DATE DECISION MAILED:** 2/23/2005

---

### RIGHT OF FURTHER APPEALS

As of January 1, 2005, The Unemployment Insurance Appeal Board no longer exists. Therefore, in order to determine your appeal rights, you may wish to consult an attorney.

---

**APPEARANCES:** Stephanie K. Parker, Appeals Referee; Timothy C. Matthews, Claimant; Alberto Pascual, Employer Representative; Roland Lynch, Robert Johnson, Employer Witnesses

**CLAIMS DEPUTY'S DETERMINATION:** The claimant was discharged from work for just cause in connection with the work and is disqualified from the receipt of unemployment benefits.

**STATUTORY PROVISION INVOLVED:** Title 19, Delaware Code, Section: 3314(2)



EXHIBIT
4

Summary of Evidence:

The claimant was employed by Mountaire, Inc. as a driver for the feed mill from March 24, 2003 until January 12, 2005.

The employer representative testified that the claimant was discharged for using threatening language. On December 7, 2004 the claimant told a dispatcher that he was going to get his head slapped. The claimant admitted to the feed delivery manager that he said this. He learned of this incident on December 8 or 9. He spoke with both the dispatcher and the feed delivery manager on December 10, 2004. He then likes to take time to review a situation and his notes before making a hasty decision. The claimant began a medical leave of absence on Monday December 13, 2004 and was on this leave by the time he had planned on addressing the situation with the claimant. Since the claimant was not able to drive for the employer, he did not want to ask the claimant to drive to the plant. He finally spoke to the claimant on January 7, 2005. The claimant denied making the statement. This was a threat of physical harm. The employer does not have a written policy regarding such actions. However, the employer's practice has been to suspend the employee and then terminate the employee. The suspension is just standard procedure. They never terminate anyone on the spot. He could have discharged the claimant on January 7, 2005 when the claimant was suspended. The employer does have a progressive disciplinary procedure. However, the step used depends upon the severity of the action. The employer did not receive the Notice of Charge of Discrimination regarding the claimant prior to all of this. The letter they received is dated January 6, 2005 and the envelope in which the papers were delivered is postmarked that same day. The claimant signed the papers on December 27, 2004.

The dispatcher testified that he started work on December 7, 2004 at 11:00 pm. When he arrived there was a mechanical problem involving a shut off for a conveyor belt that loads trucks. The work he had to do to address this problem took some time and things got backed up. Due to addressing this problem he had not looked at the inventory sheet. When the claimant came in he could tell that the claimant was upset. He knew that the claimant had had some words with another employee. The claimant was standing about one to one and a half feet from him and said that someone was going to get their f___ing head slapped because he was being held up. He and the claimant were the only ones in the dispatch office when the claimant made this statement. It was around 12:00-12:30 am. He said it would not be him and he left the dispatch office. He was just going to leave work and got into his truck. He realized there were drivers still on the road and figured that he had an obligation so he returned to work. The claimant was talking to the feed delivery manager when he returned to the office. After the claimant left to get his truck the feed delivery manager called back and he told the manager about what had happened. The manager talked him into staying.

The feed delivery manager testified that he was not in the plant when this occurred. He was at home asleep. He got a call at home, but did not get to it. He called back to the feed mill and spoke with the dispatcher. The dispatcher said that he was getting ready to leave the feed mill. He asked the dispatcher what was wrong and the dispatcher said that he was about to get his head slapped. The dispatcher said that the claimant had come in and was mad and saying

that they were trying to hold him up. The dispatcher said that he was not going to put up with this and he was just going to leave. He told the dispatcher that he would be in. Later he spoke with the claimant. He cannot recall whether the claimant got on the phone during that call or called him back. The claimant complained that they were holding him up from loading. He tried to get the claimant to explain to him what they were doing. The claimant said that they were pretending to be beating on bins to get the feed out and they were doing it on purpose. The claimant said that he had talked to the panel operators and was told that the switches were turned off and they were not trying to get any feed. He was confused and not sure what was going on. The dispatcher called him back and said that he had decided that he would stay for the rest of his shift and they could deal with it the next day. He is sure that he spoke with the dispatcher before he spoke with the claimant. He understood from the dispatcher that this was an intense situation. The dispatcher had said that he did not know whether he would be back the next night, so he felt the dispatcher took this seriously.

When the claimant came in the next afternoon, the claimant was coming from across the plant. He asked the claimant what had happened and the claimant said again that they were trying to hold him up. The claimant said that another driver and the dispatcher were intentionally holding him up from loading his truck. He asked the claimant what reason would they have to do that and the claimant did not know. He told the claimant that the dispatcher had said that he had made a statement that someone was going to get their head slapped. The claimant said that he believed he had said something to that effect. He told the claimant that if he did this was a matter for Human Resources. To him it is a matter for Human Resources when physical things are threatened. He went to the Human Resources office with this information.

The claimant testified that he made a claim of discrimination against the employer. He believes he made this claim in early December 2004 before the incident with the dispatcher. He filed the charge with the Division of Industrial Affairs in Milford. He then had to go back into the office to let them know what had gone on. He had to go back to the office a third time after he was discharged for the retaliation. He does not know of the Industrial Affairs procedures or when they first contacted the employer. He feels the decision to discharge him was based upon retaliation. It was not until after he made the claim of discrimination and had called the police against one of the employer's drivers. The feed delivery manager had asked him not to pursue the matter with the police. Because he had exhausted all of his efforts within the employer and felt that they had not handled it correctly, he went to the police and filed a complaint against this driver. He went to the police while he was out on medical leave in December 2004. The police talked with the feed delivery manager and told him that he had filed charges against this other driver. He believes he was discharged when he came back to work because he had gone to the police. When the issue with the driver came up he went to various levels of supervision in Mountaire and was told repeatedly that there was zero tolerance for those actions. Those levels of supervision would then get back to him and say that it was not a good time to do anything about this because they were short of drivers. He had heard from the feed delivery manager that he had written up the other driver up. He felt that a more severe action should have been taken because of what the other driver had done.

4

Appeal Docket No.: 731505

He did not work on Monday December 13, 2004, but he did work on December 14, 2004. This was after the employer representative had already gotten the statements from the dispatcher and the feed delivery manager. While the was out on the truck he got a call saying that he had to come back because the nurse had said the employer would not accept the doctor's excuse. Nothing happened between he and the dispatcher on December 7, 2004. He is not aware of making any comments to the dispatcher that night. He did not speak to the dispatcher at all that night and he is not sure whether he was in the office alone with the dispatcher at all that night. On the following afternoon or evening he did not see the feed delivery manager.

<u>Findings of Fact:</u>

This tribunal finds that the claimant worked for Mountaire, Inc. as a driver for the feed mill from March 24, 2003 until January 12, 2005. On December 7, 2004 the dispatcher started work at 11:00 pm. There was a mechanical problem that he had to deal with and because of this problem things got backed up. The dispatcher knew that the claimant was upset. Around 12:00-12:30 am the claimant was in the dispatch office and said that someone was going to get their f___ing head slapped. The claimant was standing about 12-18 inches from the dispatcher and the two of them were the only people in the room. The dispatcher commented that it would not be him and he left the office. The dispatcher was going to leave work, but figured that he had an obligation and returned to the office. The feed delivery manager got a call at home that night while he was asleep, but did not get to it. The manager called the feed mill and the dispatcher told him that he was getting ready to leave. The dispatcher told the manager what had happened. At some point after talking with the dispatcher, the feed delivery manager spoke with the claimant. The claimant complained about the dispatcher and a driver holding him up from loading. The dispatcher then called the feed delivery manager back and said that he would stay for the rest of his shift. The following afternoon or evening the feed delivery manager spoke to the claimant about what had happened. The manager told the claimant what the dispatcher had said the claimant said the previous night. The claimant said that he believed he had said something to that effect. The feed delivery manager said that this was a matter for Human Resources.

The employer representative learned of this incident on December 8 or 9, 2004. He spoke with both the dispatcher and the feed delivery manager on Friday December 10, 2004. The employer representative then took some time to review the situation and his notes before making a decision on what to do. The claimant did not work on Monday December 13, 2004. The claimant began working on December 14, but was called back to the feed mill because the employer would not accept his doctor's note. After that the claimant was out from work until January on a medical leave of absence. When the employer representative made his decision to discharge the claimant for using threatening language, the claimant was on the medical leave of absence. Because the claimant could not drive for the employer, the employer representative did not want to have to drive to meet with him. When the claimant returned to work on January 7, 2005 he was suspended. On January 12, 2005 the claimant was discharged. The employer does not have a written policy regarding the use of threatening language, however,

PAGE10

11-05-2007 13:11    MS. OHARA- JONES 3052423713

302423713

11/06/2007 08:00

RX Date/Time    11/06/2007 08:00    302423713                                      P.010

their practice has been to suspend the employee and then terminate the employee. The suspension is just standard procedure.

While the claimant was on medical leave in December 2004 he filed charges with the police against another driver for a previous incident that had occurred at work with this driver. After the incident the claimant spoke with various levels of supervision regarding the driver's actions and he understood that the employer had zero tolerance for such conduct. Later, he understood from the people in supervision that the employer was short of drivers and it was not a good time to do anything. The feed delivery manager told the claimant that the other driver was written up. The claimant felt that a more severe action should have been taken against the driver. The claimant believes that he was discharged for going to the police about this driver because the feed delivery manager had asked him to not go to the police. On December 27, 2004 the claimant signed a charge of discrimination with the Division of Industrial Affairs against the employer. In that charge is mentioned the employer's handling of the incident with the other driver as well as the claimant's medical leave. This charge was mailed to the employer on January 6, 2005.

<u>Conclusion of Law:</u>

Section 3314(2), Title 19, Delaware Code, provides as follows:

> "An individual shall be disqualified for benefits:
>
> **(2) For the week in which the individual was discharged from the individual's work for just cause in connection with the individual's work and for each week thereafter until the individual has been employed in each of 4 subsequent weeks (whether or not consecutive) and has earned wages in covered employment equal to not less than 4 times the weekly benefit amount.**

The issue in this case is whether the employer had just cause to discharge the claimant from his job. The employer has the burden in a discharge case to establish just cause to discharge a claimant, which could result in the denial of unemployment benefits to the claimant. Just cause has been defined under the law as a willful or wanton act either in violation of the employer's interests, the employee's duties, or the employee's expected standard of conduct. The employer must show by a preponderance of evidence that the work behavior or work performance of the claimant represented willful or wanton misconduct.

Willful or wanton misconduct, such as would constitute just cause for the claimant's discharge, requires a showing that the claimant was conscious of his conduct and recklessly indifferent of its consequences. In this case the claimant's statement in the dispatch office is open to interpretation. The claimant never specifically directed this statement to the dispatcher. Instead, the claimant simply referred to "someone". While the dispatcher may have been the only other person in the office at the time the claimant made the statement, it cannot necessarily

be inferred that the claimant was directing the statement to the dispatcher. Even the dispatcher stated that he knew the claimant was upset when the claimant came into the office. Thus, it is possible that the claimant was upset with someone else and simply made this statement out of frustration.

In addition, there is no evidence to show that the claimant was ever warned about the use of threatening language or that he was ever informed of the employer's usual practice for dealing with the use of threatening language. This tribunal accepts that the employer's general practice is to discharge any employee for the use of threatening language. However, the claimant had been given no information from which he would know that this was the employer's practice. While the claimant was certainly aware of the words that he was speaking, without any prior warning or any information regarding the employer's discipline for such verbalization, this tribunal cannot find that the claimant acted with a reckless indifference of the consequences. The claimant could not have known of the consequences in order to recklessly disregard them. Consequently, this tribunal concludes that while the claimant's comment may have been improper, it does not rise to the level of willful or wanton misconduct and the employer has not met its burden of proving just cause for the claimant's discharge.

<u>Decision:</u>

The decision of the Claims Deputy is **REVERSED**. The claimant was discharged by his employer without just cause in connection with his work. Therefore, the claimant is **NOT DISQUALIFIED** from receiving unemployment insurance benefits pursuant to Section 3314(2), Title 19, Delaware Code and will be eligible to receive benefits for each week of unemployment insurance benefits claimed for which the division determines he meets the eligibility requirements of Section 3315, Title 19, Delaware Code. The division shall issue a determination for any week(s) of unemployment insurance benefits claimed for which the claimant is subsequently deemed ineligible to receive benefits.

Stephanie K. Parker
Appeals Referee

EXHIBIT 5

A00005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TIMOTHY MATTHEWS,

    Plaintiff,

v.

MOUNTAIRE FARMS OF
DELAWARE, INC. et al.,

    Defendants.

Civil Action No. 06-330 GMS

### AFFIDAVIT

1. I am the Plaintiff in the above-captioned civil action.

2. I have read the foregoing Complaint and confirm that the facts therein are true and correct to the best of my knowledge, information, and belief.

3. I have filed this Complaint in good faith and solely for the purposes set forth in it.

4. The claims, assertions, representations in the Amended Complaint in the above captioned action are incorporated by reference as if fully set out herein.

5. I deny that I ever threatened another employee by uttering the phrase, "someone is going to get their freaking head slapped".

6. I reaffirm my claim that I was summarily terminated on January 7, 2005.

SWORN TO AND SUBSCRIBED before me this 12 day of Nov, 2007
2007.

DAWN M. HOLLETT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires June 21, 2008

11-13-07

EXHIBIT
5