IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TIMOTHY MATTHEWS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-330 GMS |
| | ) | |
| MOUNTAIRE FARMS OF | ) | |
| DELAWARE, INC. *et al.*, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

**I.    INTRODUCTION**

On May, 19, 2006, the plaintiff, Timothy Matthews ("Matthews"), filed the present lawsuit against his former employer, Mountaire Farms of Delaware, Inc. ("Mountaire" or the "defendant"), and six individual current or former Mountaire employees, alleging retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").[1] (D.I. 2.)  Matthews also claimed violations of the Occupational Safety and Health Act of 1970 ("OSHA"), 19 U.S.C. §§ 651 *et seq*., and the Delaware Discrimination in Employment Act, 19 Del. C. § 711.[2] (Id. at 2-3.)  Presently before the court is Mountaire's motion for summary judgment.  (D.I. 18.)  For the reasons that follow, the court will grant the motion.

---

[1] In his answering brief to the defendants motion for summary judgment, Matthews concedes that the six individuals are not proper parties to the suit, and that summary judgment should be granted dismissing those parties from the suit.  (D.I. 25 at 18.)

[2] Matthews further concedes in his answering brief that summary judgment in Mountaire's favor is appropriate on the OSHA and Delaware statute claims.  (Id.)

## II.    BACKGROUND

### A.    The Betts Incident

The defendant, Mountaire, processes poultry for retail customers in Millsboro, Delaware. (D.I. 19 at 4.) Mountaire has a feed mill that receives and stores chicken feed, which is loaded onto feed trucks, 80,000 pound gross weight vehicles. (Id. at 2, 4.) On March 24, 2003, Mountaire hired Matthews, an African American male, to work as a feed truck driver. (Id.) One day, in early August of 2004, Matthews was unable to get his feed truck to move. (Id. at 4.) He told his supervisor, Roland Lynch ("Lynch"), about the problem, and Lynch and another truck driver employed by Mountaire, Steven Toomey ("Toomey"), inspected Matthews' car. (Id.) They discovered that two quarters had been inserted into the truck's air flow system, also known as the "glad hands." (Id. at 4-5.) The coins blocked the flow of air to the brakes, which disabled the vehicle and prevented Matthews from moving the truck. (Id. at 5.) Toomey removed the coins after several minutes, and Matthews was then able to drive his truck. (Id.) Matthews subsequently learned that another Mountaire feed truck driver, Wells Betts ("Betts"), a Caucasian male, had placed the coins in the air flow system of the truck. (Id.) According to Betts' Affidavit, attached to the defendants' opening brief in support of their summary judgment motion, Betts did so because Matthews had cut him off on the road twice, almost causing two accidents the week before. (D.I. 20-3 at 2.) Matthews told Lynch that Betts was responsible for the quarters found in the glad hands of his truck. (D.I. 19 at 5.) Lynch questioned Betts about the incident, and Betts admitted what he had done. (Id.)

Several days later, Matthews asked Lynch what he planned to do about Betts' conduct. (Id.) Lynch responded by asking Matthews what he wanted done, and also suggested that Matthews "forget about it and go about [his] business." (D.I. 20-2 at 3.) Lynch ultimately told Matthews that

he would discuss the matter with his supervisor, Michael Stuck ("Stuck"), the feed mill manager. (D.I. 19 at 6.)  During their discussion, Stuck directed Lynch to refer the matter to the Human Resources Department.  (Id.)  On August 13, 2004, the Director of Human Resources, along with Stuck, Matthews, Betts, and Lynch met in the Human Resource office to address the incident, at which time Betts admitted placing the coins in Matthews' truck.  (Id.)  On August 16, 2004, Betts received a Notice of Unacceptable Workplace Behavior and Final Warning.  (Id.)  The warning stated that any future violations of company policies would result in further disciplinary action, including the possibility of termination.  (Id.)

   B.    **Matthews' Health Related Problems**

On December 13, 2004, Matthews told Lynch he would be absent from work for a couple days because he was experiencing lightheadedness and dizziness.  (D.I. 19 at 7.)  The next day, however, Matthews returned to work with a doctor's note that stated that he was experiencing these symptoms, but was able to return to work.  (Id.)  The note also indicated that Matthews had scheduled an appointment to see a neurologist on December 16, 2004.  (Id.)  When Lynch saw Matthews at work and asked him how he felt, Matthews said he still felt dizzy.  (Id.)  Lynch called Lori Carey ("Carey"), a nurse in Mountaire's Medical Department, to investigate why Matthews had been cleared to return to work when he still did not feel well.  (Id.)  Carey contacted the head of the Medical Department, Claudia Pittman ("Pittman"), who informed her that Matthews could not return to work if he was experiencing dizzy spells.  (Id.)  Carey relayed this information to Lynch, and also instructed him that Matthews should keep his appointment to see the neurologist.  (Id. at 7-8.)  As it turned out, Matthews did not see the neurologist on December 16th.  (Id. at 8.)  When he went to work that morning, Mountaire notified him that he could not return to work until he was examined

and cleared by a neurologist.  (Id.)

On December 21, 2004, Matthews presented Mountaire with a note from Dr. Ahuja ("Dr. Ahuja"), a neurologist, stating that he could return to work.  (Id.)  Because the note did not specify whether Matthews had any restrictions with regard to his driving, Carey called the neurologist for additional information.  (Id.)  According to Dr. Ahuja, if Matthews felt dizzy while he was driving, he should pull over to the side of the road.  (Id.)  Carey told Pittman about Dr. Ahuja's opinion, and Pittman asked the Milford Occupational Health Group, the organization that conducts physicals for Mountaire's truck drivers, what should be done about Matthews's condition.  (Id. at 8-9.)  The organization advised Pittman that Matthews needed a "fit for duty" exam before he could return to work.  (Id.)

### C.    Matthews' Charge of Discrimination and Termination from Mountaire

On December 27, 2004, Matthews filed charges of discrimination with the Delaware Department of Labor (the "DDOL"), apparently alleging that the placement of quarters in his vehicle by Betts was racially motivated, and that Mountaire retaliated against Matthews as a result of his internal complaints of race discrimination.  (D.I. 2 at 2.)  On January 6, 2005, Matthews was examined and cleared to return to work.  (D.I. 19 at 14.)  When he returned, on January 7, 2005, Lynch suspended him pending an investigation into allegations that Matthews had threatened an employee on December 8, 2004.  (Id.)  Matthews was instructed to call the company on January 11, 2005, at which time Mountaire would inform him of the outcome of the investigation.  (Id.)  Matthews never called.  (Id.)  Consequently, Mountaire terminated him on January 11, 2005,  for threatening a co-worker.  (Id.)

###### D.     The Present Lawsuit

On May 19, 2006, Matthews filed the present lawsuit against Mountaire and six individual current or former Mountaire employees, alleging retaliation for engaging in protected activity in violation of Title VII, violations of the OSHA, and violations of the Delaware Discrimination in Employment Act, 19 Del. C. § 711.  (D.I. 2.)  On December 18, 2006, Matthews filed an amended complaint against Mountaire, alleging that it violated Title VII by retaliating against him for complaining about Betts' "racially motivated misconduct," and the "lack of meaningful sanctions" imposed by Mountaire against Betts.  (D.I. 13-2; D.I. 25 at 16.)  Matthews contends that he engaged in protected activity by reporting Betts' conduct internally to Mountaire, reporting the incident to the state police, and filing a complaint of discrimination with the DDOL.  (D.I. 25 at 14.)  Matthews further alleges that Mountaire took adverse actions against him by requiring him to visit several doctors before he could return to work, placing him on short-term disability during the period he was unable to work, and terminating him.  (Id. at 16.)  Finally, Matthews avers that the adverse actions were linked to his protected activity.  (D.I. 25 at 16.)  On July 9, 2007, Mountaire filed a motion for summary judgment, alleging that Matthews has failed as a matter of law to establish a prima facie case of retaliation under Title VII.  (D.I. 18.)

### III.     STANDARD OF REVIEW

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Biener v. Calio*, 361 F.3d 206, 210 (3d Cir. 2004).  In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the

light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. *See Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 180 (3d Cir. 1999). Thus, a trial court should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment can satisfy its burden by showing that there is an "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby*, 477 U.S. at 257. Thus, summary judgment is particularly appropriate where the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor. In this situation, it may be said that the record as a whole points in one direction and the dispute is not "genuine." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

## IV.    DISCUSSION

Mountaire asserts that there are no genuine issues of material fact as to Matthews' retaliation claim. The statutory prohibition against retaliation reads as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). The proper mode of analysis for a claim of retaliation under this provision is the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case

of retaliation, the defendant bears the subsequent burden of proffering a non-discriminatory reason for its actions, and the plaintiff bears the final burden of undermining the defendant's proffered reason. *Id.* at 802-04. At stage one, the plaintiff's prima facie case of retaliation consists of three elements: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997).

Once the plaintiff has established a prima facie case, the burden of production switches to the defendant, who must "articulate some legitimate, nondiscriminatory reason" for the adverse employment decision. *McDonnell Douglas*, 411 U.S. at 802. If the defendant produces sufficient reasons for its actions, the burden shifts back to the plaintiff to demonstrate that the defendant's reasons are merely a pretext for discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). To defeat a motion for summary judgment under this framework, the plaintiff must point to some evidence from which the "factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

In the present case, Matthews alleges that he was terminated in retaliation for complaining to Mountaire and the DDOL about Betts' racially motivated "sabotage" of his vehicle and Mountaire's response to Betts' conduct. (D.I. 25 at 14.) The defendant contends that Matthews' retaliation claim should be dismissed, because Matthews has failed to carry his burden of proving a prima facie case of retaliation. The court will now address each element of Matthews' prima facie case.

First, Matthews argues that he engaged in activity protected by Title VII when he complained to Mountaire internally, filed a police report against Betts, and charged discrimination based on race with the DDOL. (D.I. 25 at 13-14.) Title VII's anti-retaliation provision protects those who participate in Title VII proceedings, and those who oppose discrimination made unlawful by Title VII. *Slagle v. County of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006). Protected activity does not necessarily mean a formal action taken by the employee against the employer. *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d Cir. 2006). "Opposition" to discrimination for purposes of a prima facie case of retaliation "can take the form of informal protests of discriminatory employment practices, including making complaints to management." *Id.* (quoting *Curay-Cramer v. Ursuline Academy Of Wilmington, Del., Inc.,* 450 F.3d 130, 135 (3d Cir. 2006)). Because the defendant concedes that Matthews engaged in protected activity when he filed a complaint with the DDOL, the court concludes that Matthews has satisfied the first element of his prima facie case. (D.I. 19 at 14.)

Regarding the second element of the prima facie case, a plaintiff must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse," which means that the actions "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 2415 (2006) (citations omitted). Matthews alleges that Mountaire took adverse action against him by requiring him to visit several doctors, placing him on short-term disability while he was absent from work due to his health, and finally, terminating him. (D.I. 25 at 10.) Because Mountaire concedes that Matthews suffered an adverse employment action when he was terminated on January 11, 2005, the court finds that Matthews has satisfied the second element of a prima facie case of retaliation.

Finally, with respect to the third element of the prima facie case, Mountaire argues that there is no causal connection between the charge of discrimination with the DDOL and Matthews' termination of employment. More specifically, Mountaire argues that it did not receive notice of the charge from the DDOL until January 12, 2005, the day after Matthews was fired for threatening an employee in a separate and unrelated incident. (D.I. 29 at 7-8.)

To establish a causal connection between the employee's protected activity and the employer's adverse action, the employer must have knowledge of the protected activity. *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (concluding that a reasonable juror could not find that the employer's adverse actions were causally connected to the employee's protected activity where the employee presented no evidence that the supervisors responsible for the adverse actions had knowledge of the protected activity); *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 797 (7th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."). While Matthews argues that he was terminated because of his complaint of discrimination to the DDOL, he has failed to point to any record evidence that Mountaire had knowledge of his charge when it terminated him. Instead, Matthews relies upon his legal conclusion that "there is temporal proximity between the making of his complaint and his termination." (D.I. 25 at 19.) Temporal proximity alone, however, ordinarily is not enough to establish a causal connection between the protected activity and the employer's adverse action. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006). As previously mentioned, there is a dearth of record evidence to support Matthews' contention that Mountaire had knowledge of his charge with the

9

DDOL when he was terminated on January 11, 2005.[3]  Thus, this case is not one of those "extraordinary cases where the plaintiff can demonstrate causation simply by pointing to the timing of the allegedly retaliatory action." *Robinson*, 120 F.3d at 1302.  Consequently, the court finds that Matthews has failed to proffer sufficient evidence to allow a reasonable juror to find a causal link between his protected activity and the adverse employment action taken by Mountaire.

In sum, based on the record before it, the court finds that Matthews has not presented sufficient evidence to establish a prima facie case of retaliation.  Because Matthews has not met his burden of establishing a prima facie case, the court need not consider the other prongs of *McDonnell Douglas*, and the defendant is entitled to summary judgment on Matthews' retaliation claim.

Dated: April 22, 2008                          /s/ Gregory M. Sleet
                                               CHIEF, UNITED STATES DISTRICT JUDGE

---

[3]As a last ditch effort, Matthews argues that his internal complaint to Lynch establishes any missing causal link necessary to make his prima facie case.  This argument is without merit, as Matthews has not even attempted to demonstrate that his verbal internal complaint to Lynch regarding the Betts incident had anything to do with his race or his opposition to racial discrimination.  Indeed, the police report that Matthews filed against Betts regarding the incident, on which he relies to support his contention that the incident concerned racial hostility, does not mention anything about racial animus.  Rather, the portion of the report relating to "Suspected Hate/Bias" is marked "No."  (D.I. 13, Ex. 5.)  Moreover, other than the fact that Betts is Caucasian and Matthews is African American, the record is completely devoid of any evidence indicating that Matthews was terminated in retaliation for reporting acts of racial discrimination to Lynch.  Given the foregoing, the court does not need to determine whether there is a causal link between Matthews' termination and his internal complaint to Lynch, because Matthews has failed to demonstrate that he engaged in Title VII protected activity when he complained to Lynch about the Betts incident.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TIMOTHY MATTHEWS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-330 GMS |
| ) | |
| MOUNTAIRE FARMS OF ) | |
| DELAWARE, INC. *et al.*, ) | |
| ) | |
| Defendant. ) | |

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

1.     The defendant's Motion for Summary Judgment (D.I.18.) is GRANTED.

2.     The Clerk of Court is directed to close this case.

Dated: April 22, 2008                    /s/ Gregory M. Sleet_____
                                         CHIEF, UNITED STATES DISTRICT JUDGE